AZARI ALMUTAIRI and     \*      IN THE

AHMAD A. ALMUTAIRI

Block 6, Street, House 2     \*      CIRCUIT COURT

Mishref, Kuwait

    \*      FOR

      Plaintiffs

    \*      BALTIMORE CITY

v.

    \*

THE JOHNS HOPKINS HEALTH

SYSTEM CORPORATION     \*      Case No.: 24-C-15-4722

601 North Broadway

Baltimore, MD 21205     \*

SERVE ON: Resident Agent     \*

     Joanne E. Pollack, Esquire

     600 North Wolfe Street     \*

     Administration Bldg. 414

     Baltimore, MD 21205     \*

and     \*

THE JOHNS HOPKINS HOSPITAL, INC.,     \*

d/b/a THE JOHNS HOPKINS HOSPITAL

601 North Broadway     \*

Baltimore, MD 21205

    \*

SERVE ON: Resident Agent

     Joanne E. Pollack, Esquire     \*

     600 North Wolfe Street

     Administration Bldg. 414     \*

     Baltimore, MD 21205

    \*

and

    \*

THE JOHNS HOPKINS UNIVERSITY

3400 North Charles Street     \*

Baltimore, MD 21218

    \*

SERVE ON: Resident Agent

     Mark Rotenberg     \*

     General Counsel

     3400 N. Charles St.     \*

     Baltimore, MD 21218

    \*

and

CIRCUIT COURT
BALTIMORE CITY
2015 SEP 14 PM 3:1
CIVIL DIVISION

Case: 24-C-15-004722
CV File New
            $80.00
R1F-New Case
            $30.00
Appear Fee
            $30.00
MLSC
            $55.00
TOTAL         $195.00

COMMENT:
Additional $10.00 needs
part of new filing fees
is $20.00 per attorney

Receipt #201500022227
Cashier: REJ CCBCXB2
09/15/15  9:17am



EXHIBIT

A

ALL-STATE LEGAL SUPPLY CO.

|  | * |
|---|---|

JOHNS HOPKINS BAYVIEW MEDICAL   *
CENTER, INC., d/b/a JOHNS HOPKINS  *
BAYVIEW MEDICAL CENTER
4940 Eastern Avenue       *
Baltimore, MD 21224

              *

SERVE ON: Resident Agent
   Joanne E. Pollack, Esquire   *
   BRB 102
   Johns Hopkins Health System  *
   Corporation
   733 North Broadway    *
   Baltimore, MD 21205

              *

and

              *

MAHMOUD MALAS, M.D.
Johns Hopkins Bayview Medical Center *
4940 Eastern Avenue
Baltimore, MD 21224       *

and             *

THOMAS REIFSNYDER, M.D.   *
Johns Hopkins Bayview Medical Center
4940 Eastern Avenue       *
Baltimore, MD 21224

              *

and             *

JOHNS HOPKINS COMMUNITY  *
PHYSICIANS, INC., and/or JOHNS
HOPKINS COMMUNITY PHYSICIANS
3100 Wyman Park Drive     *
Baltimore, MD 21211

              *

SERVE ON: Resident Agent
   Joanne E. Pollack, Esquire   *
   600 North Wolfe Street
   Administration Bldg. 414    *
   Baltimore, MD  21205

              *

   Defendants

*  *  *  *  *  *  *  *  *  *  *  *  *

## COMPLAINT

COME NOW Plaintiffs, Azari Almutairi and Ahmad A. Almutairi, by and through their attorneys, Howard A. Janet, Esquire, Giles H. Manley, M.D., J.D., Jason B. Penn, Esquire and Janet, Jenner & Suggs, LLC, and hereby file a Complaint against Defendants, The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center, Mahmoud Malas, M.D., Thomas Reifsnyder, M.D., and Johns Hopkins Community Physicians, Inc. and/or Johns Hopkins Community Physicians, and for cause and in support of their claim respectfully state as follows:

## INTRODUCTION

1.      On May 3, 2012, Azari Almutairi (hereinafter "Mrs. Almutairi") was admitted to Johns Hopkins Hospital where she underwent a saphenous vein bypass and tendon release to increase the function of her right leg. Although surgery was successful and she was able to walk shortly thereafter, in the weeks and months that followed, Mrs. Almutairi required numerous surgical interventions secondary to Defendants failure to protect her vascular supply post surgically. The negligence on part of Defendants undermined the success of the procedure, and caused her to experience, emotional and physical pain and suffering, mental anguish, disability, disfigurement, including surgical amputation of her leg, and economic loss, past, present and future. Her injuries and losses are permanent.

## JURISDICTION AND VENUE

2.      Venue as to all claims is invoked in Baltimore City pursuant to MD. CODE ANN., CTS. & JUD. PROC. § 6-201, *et seq.*, inasmuch as (a) all Defendants reside, carry on a regular business, are employed and/or habitually engage in a vocation in Baltimore City; and/or

(b) the cause of action arose in Baltimore City, in that the injuries proximately caused by the alleged negligence of the Defendants occurred at Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center located in Baltimore City, Maryland. Furthermore, all the Defendants, The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center, Mahmoud Malas, M.D., Thomas Reifsnyder, M.D., and Johns Hopkins Community Physicians, Inc. and/or Johns Hopkins Community Physicians, carry on a regular business, are employed and/or habitually engage in a vocation in Baltimore City. Additionally, the cause of action arose in Baltimore City, in that the irreversible injuries proximately caused by the alleged negligence of the Defendants occurred at Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center, located in Baltimore City, Maryland.

3.      Jurisdiction is proper in Baltimore City Circuit Court in that all conditions precedent to filing this suit have been met. This case was initially filed in the Health Care Alternative Dispute Resolution Office of Maryland as *Azari Almutairi and Ahmad A. Almutairi v. The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc., d/b/a The John Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center, Mahmoud Malas, M.D., Thomas Reifsnyder, M.D., and Johns Hopkins Community Physicians, Inc., and/or Johns Hopkins Community Physicians,* Case No.: 2015-186, along with an Election to Waive Arbitration, and the Certificate of Qualified Expert and Report of Martin Evans, M.D., copies of which are collectively attached hereto as **Exhibit A** and the Order of Transfer is attached hereto as **Exhibit B**.

4.     Damages are in excess of the required jurisdictional amount under MD. CODE, CTS. & JUD. PROC. § 3-2A-02.

## THE PARTIES

5.     At all times relevant, Plaintiff Azari Almutairi was a resident of the State of Maryland, residing in Baltimore County.

6.     At all times relevant, Plaintiff Ahmad A. Almutairi (hereinafter referred to as "Mr. Almutairi") was a resident of the State of Maryland, residing in Baltimore County.

7.     At all times pertinent hereto, Defendant The Johns Hopkins Health System Corporation, a professional services corporation organized under the laws of the State of Maryland, with its principal place of business in Baltimore City, Maryland, held itself out to the public as competent to provide medical, surgical and nursing services, and indeed did provide such care and services to Mrs. Almutairi, directly and by and through its principals and/or actual and/or apparent agents, servants and/or employees, who at all times acted within the scope of their authority in providing care to Plaintiffs.

8.     At all times pertinent hereto, Defendant The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, a professional services corporation organized under the laws of the State of Maryland, with its principal place of business in Baltimore City, Maryland, held itself out to the public as competent to provide medical, surgical and nursing services, and indeed did provide such care and services to Mrs. Almutairi, directly and by and through its principals, and/or actual and/or apparent agents, servants and/or employees, who at all times acted within the scope of their authority in providing care to Plaintiffs.

9.     At all times pertinent hereto, Defendant The Johns Hopkins University, a professional services corporation organized under the laws of the State of Maryland, with its

principal place of business in Baltimore City, Maryland, held itself out to the public as competent to provide medical, surgical and nursing services, and indeed did provide such care and services to Mrs. Almutairi, directly and by and through its principals and/or actual and/or apparent agents, servants and/or employees, who at all times acted within the scope of their authority in providing care to Plaintiffs.

10.      At all times pertinent hereto, Defendant Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center, a professional services corporation organized under the laws of the State of Maryland, with its principal place of business in Baltimore City, Maryland, held itself out to the public as competent to provide medical, surgical and nursing services, and indeed did provide such care and services to Mrs. Almutairi, directly and by and through its principals, and/or actual and/or apparent agents, servants and/or employees, who at all times acted within the scope of their authority in providing care to Plaintiffs.

11.      At all times pertinent hereto, Defendant Johns Hopkins Community Physicians, Inc. and/or Johns Hopkins Community Physicians, a professional services corporation organized under the laws of the State of Maryland, with its principal place of business in Baltimore City, Maryland, held itself out to the public as competent to provide medical, surgical and nursing services, and indeed did provide such care and services to Mrs. Almutairi, directly and by and through its principals and/or actual and/or apparent agents, servants and/or employees, who at all times acted within the scope of their authority in providing care to Plaintiffs.

12.      At all times pertinent hereto, Defendant Mahmoud Malas, M.D., (hereinafter, "Dr. Malas"), was licensed to practice medicine in the state of Maryland, and held himself out to the public as a competent practitioner of vascular surgery. At all times relevant in rendering care to

Mrs. Almutairi, Dr. Malas was employed in, and habitually carried on a vocation in Baltimore City, Maryland.

13.     At all times pertinent hereto, Dr. Malas acted individually, and as the actual and/or apparent agent, servant and/or employee of The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center and Johns Hopkins Community Physicians, Inc. and/or Johns Hopkins Community Physicians, and did so within the scope of his employment and authority.

14.     At all times pertinent hereto, Defendant Thomas Reifsnyder, M.D., (hereinafter, "Dr. Reifsnyder"), was licensed to practice medicine in the state of Maryland, and held himself out to the public as a competent practitioner of vascular surgery. At all times relevant in rendering care to Mrs. Almutairi, Dr. Reifsnyder was employed in, and habitually carried on a vocation in Baltimore City, Maryland.

15.     At all times pertinent hereto, Dr. Reifsnyder acted individually, and as the actual and/or apparent agent, servant and/or employee of The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center and Johns Hopkins Community Physicians, Inc. and/or Johns Hopkins Community Physicians, and did so within the scope of his employment and authority.

16.     At all times relevant hereto, each of the Defendants, including their principals, and/or actual and/or apparent agents, servants and/or employees acted as the actual and/ or apparent agents, servants and/or employees of each other.

17.     At all times pertinent hereto, Mrs. Almutairi was a patient of the above Defendants *(hereinafter referred to collectively as:* The Defendants) for the purpose of receiving health care and treatment.

## FACTS COMMON TO ALL COUNTS

18.     Mrs. Almutairi is a cancer survivor. Mrs. Almutairi had a history of spindle cell carcinoma, a type of connective tissue cancer. During the resection of her tumor, Mrs. Almutairi's popliteal artery in her right leg was injured. The popliteal artery and its branches supply blood to the knee, muscles in the thigh and calf, as well as the structures making up the ankle and foot. Over time, scarring from this surgery left her with a significant right knee contracture and decreased circulation through the popliteal artery. She was unable to walk without significant pain because of her knee contracture.

19.     In 2012, Mrs. Almutairi came under the care of Defendants Dr. Scott Lifchez, plastic surgeon, Dr. Mahmoud Malas, vascular surgeon, and Dr. V. Franklin Sechriest, orthopedic surgeon, for treatment of her right leg. It was determined she would need orthopedic surgery to release scar damage to her knee and ankle, plastic surgery to place grafts for wound coverage and vascular surgery to ensure adequate blood supply. Angiograms determined the previous popliteal artery reconstruction showed a degree of obstruction within the artery. Nonetheless, her vascular supply was intact, allowing blood flow into her leg and foot. The Defendants knew that protecting her vascular supply would be very important to ensure that adequate blood supply was maintained to her lower leg, ankle and foot in order to promote healthy healing.

20.     On May 3, 2012, Mrs. Almutairi was admitted to Johns Hopkins Bayview Medical Center where she underwent a surgical procedure to release her contractures to increase

the functioning of her leg and ankle, skin grafts and flaps to protect and cover the surgical sites, and vascular bypass to ensure adequate blood flow. Specifically Defendants performed a saphenous vein femoral/poplitealarterial bypass from the mid superficial femoral artery to the tibioperoneal trunk (this is where the popliteal artery ends just before coming the posterior tibial and fibular arteries which supply the lower leg and foot), release of thigh muscle and ankle tendons, and a local tissue re-arrangement.    There is no indication that Mrs. Almutairi's coagulation status was monitored during the vascular part of the procedure, therefore it is unknown as to whether the level was sufficient to prevent all clot formation in the bypass. At the conclusion of the entire procedure, her knee was in a position of full extension. Doppler ultrasonography examination of her posterior tibial artery at the conclusion of surgery demonstrated positive blood flow.

21.     Following surgery, Mrs. Almutairi was transferred to the ICU for "frequent neurovascular monitoring" and flap checks on her right lower extremity. During her initial recovery, due to the instability of her knee joint, she was kept with strict bed rest and a splint. Approximately ten days postoperatively she was able to stand and walk a few steps.

22.     Post operatively, she received a number of medications, including continuation of her oral contraceptive Yaz. Oral contraceptives are contraindicated before and after vascular surgery, and in particular, Yaz, as it is known to have a much higher rate of thrombotic complications.

23.     Postoperative monitoring of Mrs. Almutairi's platelet counts was conducted. Beginning on May 10, 2012, and lasting through May 16th, Mrs. Almutairi's platelet count was consistently elevated, frequently to dangerously high levels thereby increasing the risk of arterial thrombosis.

24.     On May 15, at 1239, a physical therapist observed that Mrs. Almutairi's protective splints and foot plate were again not placed correctly, and that her foot was cold and purple. She notified the nurse who immediately paged Defendants from vascular surgery. Approximately 2 hours later, a Resident physician documented a positive Doppler signal in the posterior tibial artery, however there is no indication that he discussed this further with an attending physician. Unfortunately this test gives no information as to whether or not the flow is compromised, only that some is present. Negligently, no further testing such as an ankle brachial index (ABI), a test that definitively identifies if a, and what degree of, vascular compromise is present, was ordered.

25.     Sometime later that evening, on May 15, 2012, Doppler examination of her posterior tibial artery did not detect a signal, a clear sign the bypass vessel was compromised. Therefore, she was placed on systemic heparin therapy, reportedly resulting in improvement in the signal, however giving no information about the degree of compromise. More likely than not had an ABI been performed it would have shown a degree of obstruction requiring consideration of prompt surgical intervention.

26.     On May 16, 2012, at 0457, Mrs. Almutairi's platelet count was extremely elevated at 451. Also, at 0515, the Resident physician documented no Doppler in the distal posterior tibial artery, and at 0654 the plastic surgery rounding physician documented the foot was cooler than before.

27.     On May 16, 2012, approximately 3-1/2 hours later, at 0843 she underwent an angiogram which showed thrombosis of the recent bypass graft and acute occlusion of the native distal posterior tibial artery. She was diagnosed with a thrombosed arterial graft (no blood flow to the leg distal to the site of thrombosis).

28.     On May 16, 2012, at 1405 (5 hours and 22 minutes after the angiogram revealing thrombosis and over 24 hours since her foot was described as cold) she underwent corrective surgery to address her thrombosed artery.   There is no indication that Mrs. Almutairi's coagulation status was monitored during this procedure as well.

29.     A thrombosed arterial graft is a surgical emergency.   The standard of care for institutions and physicians presented with this emergency requires that re-operation within two hours is available and carried out.   Excessive delay increases the risk of damage to the microcirculation, tissue becoming necrotic, leading to gangrene and limb amputation.   Further testing such as an ABI should have been ordered on May 15.   Ultimately, it took more than 5 hours from a diagnosis of total occlusion of her graft until Mrs. Almutairi was returned to the operating room (O.R.) for surgery.   This delay significantly decreased her microcirculation such that, should another occlusion occur, any significant delay in re-operation would prove fatal to the ability of her foot and leg to recover.

30.     At the end of surgery, when Heparin was reversed, another clot formed.   As a consequence of that she was re-heparinized in the O.R. and then transferred to the surgical intensive care unit ("SICU") for two days for neurovascular monitoring.   Postoperatively she was continued on Aspirin ("ASA") and IV Heparin therapy for antithrombolitic therapy.

31.     Mrs. Almutairi's platelet count remained very high.   Despite her very high count, and the fact that she previously thrombosed on ASA (inhibits platelet function by blocking the production of thromboxane), no further anti-platelet medication such as Plavix (inhibits platelet function by blocking a necessary chemoreceptor on platelet cell membranes) was administered.

32.     For the next several days, ongoing Doppler studies identified positive signals in Mrs. Almutairi's right lower extremity.   An ABI on May 20, 2012 was 0.7, consistent with some

mild ischemia, however better than her baseline ABI prior to the May 3rd surgery. On May 22, 2012, in an effort to prepare her for rehabilitation, against the wishes of Dr. Malas, who was out of town at the time, the Heparin was converted to Lovenox (a long acting low molecular weight Heparin that takes about four hours to reach maximum efficacy). If Lovenox is given at the same time Heparin is stopped, a patient will be unprotected for a number of hours. In this case however, it appears the Heparin was stopped in the morning, and the Lovenox was not given until hours later, leaving Mrs. Almutairi unprotected from a thrombotic event for most of the day and evening.

33.    Following the transition from Heparin to Lovenox, Mrs. Almutairi's right foot developed increasing edema and became mottled and cool. As well, she had absent pedal Doppler signals. Heparin was re-initiated late that evening.

34.    On May 23, 2012, she was again diagnosed with a thrombosed graft. This time more than six hours passed before she was taken back to the operating room for a revision of the right superficial femoral artery to posterior tibial bypass with a left greater saphenous vein interposition graft. The negligence and injuries heretofore mentioned combined with the events from May 22 and the unacceptable delay in reoperation on May 23, more likely than not damaged the circulation in Mrs. Almutairi's leg and foot to such a degree that functional recovery was doubtful and that she would need to undergo many more painful procedures including amputation of her toes, and eventually her leg

35.    On June 6, 2012, she was noted to have copious bloody drainage emanating from her Vacuum Assisted Closure (VAC) dressing. Yet again, she was taken to the operating room where arterial bleeding was identified from her prior bypass graft. The graft was infected. She underwent removal of her infected vein graft with revision of the bypass graft to the posterior

tibial artery using harvest of the left arm basilica vein. Following this operation she was maintained on Heparin. Not unexpectedly, she continued to have very weak Doppler signals in her foot and began to demonstrate dry gangrene of her toes.

36.     Over the weeks that followed, she underwent multiple procedures in the operating room which involved irrigation and painful debridement of her lower extremity wounds and replacement of VAC dressings.

37.     Because of the dry gangrene of her toes, on July 9, 2012 she underwent an amputation through the meta-tarsal bones.

38.     On the evening of July 21, 2012, she developed an acute, life threatening hemorrhage from the medial aspect of her right leg wound. She was taken to the operating room. Once again, the bypass graft had become infected. It was deemed non-salvageable. The bypass graft was ligated.

39.     During each of the first three surgeries, the arteriography was incomplete. The removal of clots was not properly assessed.

40.     On August 2, 2012, Mrs. Almutairi was returned to the operating room for a below the knee amputation. Despite the amputation, she would require a number of subsequent surgeries for various continued complications.

41.     Months after her admission, on August 16, 2012, Mrs. Almutairi was released by Defendants to undergo rehabilitation. However, because of Defendants negligence, her rehabilitation focused on teaching her to ambulate without her right leg, rather than strengthening the muscles in a functioning one.

42.     Had the Defendants adhered to the applicable standards of care, the injuries described herein suffered by Mrs. Almutairi would have been avoided. The negligent care

rendered by the Defendants, individually and by and/through their actual/apparent agents, servants and/or employees was the direct and proximate cause of the Plaintiffs' injuries.

## COUNT ONE: MEDICAL NEGLIGENCE

43.    Plaintiff Mrs. Almutairi incorporates by reference the foregoing paragraphs 1 through 42 of this Complaint as if fully set forth herein.

44.    Defendants, The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center and Johns Hopkins Community Physicians, Inc. and/or Johns Hopkins Community Physicians, directly and through their actual and/or apparent agents, servants and/or employees, including, but not limited to, Drs. Malas and Reifsnyder, who at all relevant times were acting within the scope of their authority and/or employment, owed Plaintiffs the duty to exercise that degree of care and skill which reasonably competent health care providers of like kind would have exercised in meeting the standard of care under the same or similar circumstances.

45.    Defendants, The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center and Johns Hopkins Community Physicians, Inc. and/or Johns Hopkins Community Physicians, directly and through their actual and/or apparent agents, servants and/or employees, including but not limited to, Drs. Malas and Reifsnyder, who at all relevant times were acting within the scope of their authority and/or employment, failed to act as reasonably competent health care providers would have acted under the same or similar circumstances, breached their duties and violated the applicable standards of care, and were negligent in the following ways, among others:

a.    Failing to adequately monitor Doppler pulses;

b.    Failing to manage intraoperative and postoperative care;

c.    Failing to timely appreciate the significance of, and timely respond to, signs and symptoms of arterial thrombosis;

d.    Failing to adequately splint and care for Mrs. Almutairi's leg post operatively;

e.    Failing to timely start and/or continue Heparin;

f.    Failing to timely diagnose and treat arterial thrombosis;

g.    Failing to administer appropriate medications in an appropriate time interval to prevent arterial thrombosis;

h.    Failing to stop Mrs. Almutairi's oral contraceptives;

i.    Failing to order and/or follow and/or respond to appropriate labs;

j.    Failing to perform adequate testing for detecting arterial clots;

k.    Failing to timely react to known surgical emergencies;

l.    Failing to communicate adequately among Defendants;

m.    Failing to monitor coagulation status during vascular surgery;

n.    Failing to follow the primary attending's orders; and

o.    Other negligent acts or omissions which may become apparent throughout the course of discovery.

46.    Furthermore, and in addition to the deviations set forth above, Defendants, The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center and Johns Hopkins Community Physicians, Inc.

and/or Johns Hopkins Community Physicians, directly and through their actual and/or apparent agents, servants and/or employees, departed from the standard of care for reasonably competent health care providers, failed to act as reasonably competent health care practitioners would have acted under the same or similar circumstances, breached their duties under the applicable standards of care and were negligent in at least the following ways:

    a.    Failing to adequately instruct, train, and/or supervise its agents, servants and employees;

    b.    Failing to provide appropriately trained and skilled personnel to care for Plaintiff Mrs. Almutairi;

    c.    Failing to establish and/or follow and/or enforce appropriate policies, procedures and/or protocols for arterial thromboprophylaxis;

    d.    Failing to establish and/or follow and/or enforce appropriate policies, procedures and practices to properly manage patients such as Mrs. Almutairi;

    e.    Failing to properly credential, supervise and/or provide adequate training to agents, servants and/or employees, including those who cared for Mrs. Almutairi;

    f.    Failing to have the appropriate staff, personnel and facilities to provide timely diagnosis and treatment of a surgical emergency.

47.    Dr. Malas, acting individually, and as an agent servant and/or employee of The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center and Johns Hopkins Community Physicians, Inc.

and/or Johns Hopkins Community Physicians who was acting within the course and scope of his employment, failed to follow the standards of medical practice, exercise reasonable care and skill and was otherwise negligent and careless in his care and treatment of Azari Almutairi in the following acts or omissions:

a.   Failing to timely diagnose and treat arterial thrombosis;

b.   Failing to manage intraoperative and postoperative care;

c.   Failing to administer appropriate medications in an appropriate time interval to prevent arterial thrombosis;

d.   Failing to stop Mrs. Almutairi's oral contraceptives;

e.   Failing to order and/or follow and/or respond to appropriate labs;

f.   Failing to perform adequate testing for detecting arterial clots;

g.   Failing to timely react to known surgical emergencies;

h.   Failing to communicate adequately among Defendants;

i.   Failing to monitor coagulation status during vascular surgery; and

j.   Other negligent acts or omissions which may become apparent throughout the course of discovery.

48.   Dr. Reifsnyder, acting individually, and as an agent servant and/or employee of The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center and Johns Hopkins Community Physicians, Inc. and/or Johns Hopkins Community Physicians who was acting within the course and scope of his employment, failed to follow the standards of medical practice, exercise

reasonable care and skill and was otherwise negligent and careless in his care and treatment of

Azari Almutairi in the following acts or omissions:

    a.    Failing to timely diagnose and treat arterial thrombosis;

    b.    Failing to manage intraoperative and postoperative care;

    c    Failing to perform adequate testing for detecting arterial clots;

    d.    Failing to timely react to a known surgical emergency;

    e.    Failing to communicate adequately among Defendants;

    f.    Failing to monitor coagulation status during vascular surgery; and

    g.    Other negligent acts or omissions which may become apparent throughout the course of discovery.

49. The above negligence of Defendants, The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center, and Johns Hopkins Community Physicians, Inc. and/or Johns Hopkins Community Physicians, directly and through their actual and/or apparent agents, servants and/or employees including but not limited to Drs. Malas and Reifsnyder, and Dr. Malas and Dr. Reifsnyder individually, who cared for Mrs. Almutairi, jointly and severally, without any negligence on the part of Plaintiffs contributing thereto, directly and proximately caused Mrs. Almutairi to sustain serious personal injury, as well as severe, painful, permanent and disabling injuries, and will continue to suffer such injuries including, but not limited to, the following:

    a.    Loss of her functioning limb;

    b.    Past and future medical expenses;

    c.    Disfigurement in the form of amputation;

d.  Inconvenience and discomfort;

e.  Embarrassment and humiliation;

f.  Mental anguish;

g.  Diminished enjoyment and quality of life;

h.  Loss of earnings and diminished earning capacity;

i.  Past and future physical pain; and

j.  The need for future medical, nursing, hospital, pharmaceutical, physical and occupational therapy, specialized services and/or equipment.

Had the Defendants adhered to the applicable standard of care, Mrs. Almutairi would not have suffered as she has in the past and will continue to suffer in the future, both economically and non-economically.

WHEREFORE, Plaintiff Azari Almutairi, requests that judgment be entered against the Defendants, The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center, Johns Hopkins Community Physicians, Inc. and/or Johns Hopkins Community Physicians, Dr. Malas, and Dr. Reifsnyder, jointly and severally, in an amount which will fairly compensate her for damages alleged herein, and interest thereon as allowed by the law and for the costs of this action.

## COUNT TWO: LOSS OF CONSORTIUM

50.  Plaintiffs, Mrs. Almutairi and Mr. Almutairi incorporate by reference and reallege paragraphs 1 through 49 as if fully set forth herein.

51.  Plaintiffs Azari Almutairi and Ahmad A. Almutairi were husband and wife at the time of the occurrences referenced in this Complaint, and continue to be husband and wife.

52.   The negligent conduct of Defendants, directly and proximately caused permanent injury to the marital relationship of Azari Almutairi and Ahmad A. Almutairi, including a loss of companionship, affection, services, assistance, and impairment of sexual relations.

53.   Mr. Almutairi has been caused, presently and in the future, to suffer of the loss of his spouse's companionship, affection, services, and assistance of Mrs. Almutairi.   The marital association between husband and wife has been impaired, depreciated and altered and, accordingly, Mr. Almutairi has been caused great mental anguish and financial burden.

**WHEREFORE,** Plaintiff Mr. Almutairi, requests that judgment be entered against Defendants, The Johns Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc. d/b/a The Johns Hopkins Hospital, The Johns Hopkins University, Johns Hopkins Bayview Medical Center, Inc. d/b/a Johns Hopkins Bayview Medical Center, Johns Hopkins Community Physicians, Inc. and/or Johns Hopkins Community Physicians, Dr. Malas, and Dr. Reifsnyder, jointly and severally, in an amount which will fairly compensate them for damages alleged herein, and interest thereon as allowed by the law and for the costs of this action.

Respectfully submitted,

Howard A. Janet, Esquire
Giles H. Manley, M.D., J.D.
Jason B. Penn, Esquire
Janet, Jenner & Suggs, LLC
1777 Reisterstown Road, Suite 165
Baltimore, Maryland 21208
Telephone: 410-653-3200
Facsimile: 410-653-9030

*Attorneys for Plaintiffs*